BARTON BARTON & PLOTKIN LLP
420 Lexington Avenue
New York, NY 10170
(212) 687-6262
*Attorneys for Plaintiff*
Roger E. Barton (RB 4142)
Howard J. Smith (HS 3556)



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FCS ADVISORS, INC. d/b/a BREVET CAPITAL ADVISORS,

          Plaintiff,

-against-

FAIR FINANCE COMPANY, INC.,

          Defendant.

Docket No.: 07 CIV 6456

JUDGE CHIN

**COMPLAINT**

      Plaintiff FCS Advisors, Inc. d/b/a Brevet Capital Advisors (FCS Advisors, Inc. d/b/a Brevet Capital Advisors and/or its subsidiaries and affiliates referred to as "Brevet"), by its attorneys Barton Barton & Plotkin LLP, as and for its complaint against defendant Fair Finance Company, Inc. (Fair Finance Company, Inc. and/or its subsidiaries and affiliates referred to as "FairFin"), alleges as follows:

### INTRODUCTION

      1.    This is an action by Brevet for unpaid sums due it from FairFin under a letter agreement between the parties regarding a potential financing transaction between Brevet and FairFin.

### PARTIES

2.  Plaintiff Brevet is and at all times hereinafter mentioned was a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 666 Third Avenue, 29th Fl., New York, New York 10017.

3.  Defendant FairFin is and at all times hereinafter mentioned was a corporation duly organized and existing under the laws of the State of Ohio, with its principal place of business located at 815 East Market Street, Akron, Ohio 44305.

## JURISDICTION AND VENUE

4.  This Court has jurisdiction over the subject matter of plaintiff's claims pursuant to 28 U.S.C. § 1332, in that complete diversity exists between plaintiff and defendant, and the matter in controversy, exclusive of interest and costs, exceeds $75,000 in value.

5.  Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §1391(a), in that defendant consented to the forum of the state and federal courts in the State of New York for the resolution of all disputes between the parties under the agreement that is the subject of this action.

## FACTUAL BACKGROUND

6.  On or about June 1, 2007, Brevet and FairFin entered into a letter of intent (the "Letter") confirming the parties' mutual interest in consummating a financing of up to $75,000,000 (the "Financing") to be structured as an asset-backed senior secured loan facility (a true and accurate copy of the Letter is annexed hereto as Exhibit A).

7.  The Letter states:

> This Letter is intended solely as a basis for further discussion and is not intended to be and does not constitute a legally binding agreement; <u>provided, however, that the provisions set forth in Sections 6 through 12 below shall be binding on the parties hereto and Sections 7 through 12 shall survive the termination hereof and of any discussions relating to the Financing Transaction among the parties hereto.</u>

(Exh. A, p. 1.) (Emphasis supplied.)

8.  Pursuant to Section 7 of the Letter, FairFin notified Brevet that it had an outstanding offer from Summit Consumer Fund, L.P. ("Summit") to purchase certain receivables. Also, pursuant to Section 7, FairFin granted Brevet a right of first refusal ("ROFR") to purchase the receivables on the same terms as Summit.

9.  Per the terms of Section 7 of the Letter, the ROFR granted Brevet the "exclusive right" to acquire the receivables and close the Facility, as defined in the Letter, or to close an alternative bridge transaction mutually acceptable to Brevet and FairFin.

10. On or about, June 14, 2007, Brevet timely notified FairFin in writing of its exercise of the ROFR and its intent to close on the financing facility as described in Section 7 of the Letter.

11. Section 7 of the Letter also provides:

> FairFin agrees that should it consummate any transaction, in lieu of the Financing Transaction with the Lender [Brevet], that such transaction would be a violation of the provisions of this Section 7. A violation of this Section 7, will render FairFin liable to Brevet for a break-up-fee of $1,500,000 ("Break-Up-Fee"). The Break-Up-Fee shall be due and payable on the closing date of the third party transaction.

(Exh. A, § 7.)

12. On June 27, 2007, FairFin notified Brevet in writing that "we have selected and intend to close on the transaction" between FairFin and Brevet.

13. The financing FairFin had in place in and around June 2007 with Textron Financial Corporation (the "Textron Financing") was set to expire on July 6, 2007. The Textron Financing was to be replaced by the Financing Transaction and, as a result, the parties agreed to and worked toward a closing date of July 6, 2007 for the Financing Transaction.

14. Because FairFin was unable to close on the Financing Transaction on or before July 6, 2007, FairFin sought and received an extension of the expiration date of the Textron Financing until July 20, 2007.

15. Brevet assisted FairFin in obtaining the extension of the Textron Financing until July 20, 2007. As a result of the extension of the Textron Financing, thereafter, Brevet and FairFin continued to work on the Financing Transaction and towards a new closing date of July 20, 2007.

16. On July 11, 2007, FairFin, through its representative, Riderwood Group, communicated to Brevet that FairFin was proceeding with a transaction in lieu of the Financing Transaction outlined in the Letter.

17. On July 12, 2007, Brevet wrote FairFin, noted that such a transaction would violate Brevet's exclusive rights under the Letter, and requested that FairFin confirm its intent by the close of business on July 13, 2007. (A true and accurate copy of Brevet's letter to FairFin, dated July 12, 2007 (the "July 12 Letter") is annexed hereto as Exhibit B.)

18. In the July 12 Letter, Brevet informed FairFin that, if it chose to proceed with a transaction in lieu of the Financing Transaction with Brevet, FairFin would owe Brevet the $1,500,000 Break-Up-Fee described in Section 7 of the Letter, plus Brevet's costs and expenses as described in Section 8 of the Letter. Further, Brevet also advised, "should you [FairFin] wish to proceed with the Financing Transaction as contemplated in the Letter, Brevet has been and remains ready, willing and able to proceed."

19. On July 13, 2007, FairFin, through counsel, responded to the July 12 Letter by denying that FairFin owed Brevet the $1,500,000 Break-Up-Fee. FairFin did not deny that it was proceeding with a transaction in lieu of the Financing Transaction with Brevet.

20. Upon information and belief, FairFin consummated a transaction in lieu of the Financing Transaction contemplated in the Letter.

## FIRST CLAIM FOR RELIEF
## FOR BREACH OF CONTRACT

21. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 20 contained hereof, with the same force and effect as if set forth fully at length herein.

22. Pursuant to the Letter, FairFin granted Brevet the ROFR which gave Brevet the "exclusive right" to acquire the receivables and close the Facility, as defined in the Letter, or to close an alternative bridge transaction mutually acceptable to Brevet and FairFin.

23. On June 14, 2007, Brevet timely exercised the ROFR in writing and notified FairFin of its intent to close on the financing facility as described in Section 7 of the Letter.

24. Brevet was at all relevant times ready, willing and able to close on the financing facility as described in Section 7 of the Letter.

25. On or about July 11, 2007, FairFin notified Brevet of its intent to proceed with another transaction in lieu of the Financing Transaction with Brevet as described in the Letter.

26. Upon information and belief, FairFin closed a third party financing transaction in lieu of the Financing Transaction contemplated in the Letter.

27. As a result of the forgoing, and pursuant to the express terms of Section 7 of the Letter, FairFin owes Brevet the $1,500,000 Break-Up-Fee.

28. In addition, pursuant to the terms of Section 8 of the Letter, Brevet is entitled to all of its costs and expenses, including its counsel fees, from FairFin.

29. By reason of the foregoing, Brevet has been damaged in an amount to be determined at trial, but not less than $1,500,000 plus attorneys' fees and the costs and expenses associated with this action.

**WHEREFORE**, plaintiff Brevet prays for judgment, as follows:

a. On the First Claim for Relief, awarding Brevet damages of at least $1,500,000, and

b. Awarding Brevet its attorneys' fees and costs and expenses, and

c. Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
July 16, 2007

**BARTON BARTON & PLOTKIN LLP**

By: _____
Roger E. Barton (RB 4142)
Howard J. Smith, III (HS 3556)
*Attorneys for Plaintiff*
420 Lexington Avenue, 18th Fl.
New York, NY 10170
Tel: (212) 687-6262
Fax: (212) 687-3667
Email: rbarton@bartonesq.com

# Brevet Capital Advisors

June 1, 2007

Mr. Timothy S. Durham
Fair Finance Company, Inc.
815 East Market Street
Akron, Ohio 44305

Re:   Possible Financing Transaction

Dear Mr. Durham:

This letter of intent (the "Letter") confirms our understanding of the mutual present interest of Brevet Capital Advisors, and/or its affiliates, partners or assigns (collectively, "Brevet" or the "Lender") and Fair Finance Company, Inc. and/or its subsidiaries and affiliates ("FairFin") in possibly proceeding with a financing (the "Financing Transaction") of up to $75,000,000. We intend that the proposed transaction will be structured as a asset-backed senior secured loan facility (the "Facility") to be made available for a period of up to three (3) years, subject to the terms and conditions set forth in this Letter (collectively, the "Financing Terms"), for the purpose of purchasing and actively managing portfolios of consumer sales finance contracts.

The parties hereto acknowledge that this Letter does not contain all matters upon which an agreement must be reached in order for the Financing Transaction to be consummated. Further, any consummation of the Financing Transaction is subject to credit approval, due diligence, and the negotiation and execution of the Financing Documents referred to below in Section 3 in form and substance satisfactory to the Lender. Accordingly, this Letter is intended solely as a basis for further discussion and is not intended to be and does not constitute a legally binding agreement; provided, however, that the provisions set forth in Sections 6 through 12 below and this paragraph shall be binding upon the parties hereto and Sections 7 through 12 shall survive the termination hereof and of any discussions relating to the Financing Transaction among the parties hereto.

1.   **Financing Transaction.** Upon the occurrence of the Financing Transaction (the "Closing"), subject to the satisfaction of all Financing Terms and conditions precedent contained in the Financing Documents, the Lender intends to make the Facility available to a to-be-formed bankruptcy remote U.S. entity (the "Borrower") which in turn is owned by FairFin. The Borrower will be able to draw on the Facility in three $25,000,000 tranches (each, a "Tranche") for each purchase, subject to Lender approval.

2.   **Key Financing Terms.**

The Facility:   Pursuant to a Receivables Purchase Agreement, FairFin shall from time to time sell certain closed-end and open-end eligible receivables ("Eligible Receivables") in a legal true sale to Borrower. The facility shall be structured as an on-balance sheet transaction.

Pursuant to a Loan and Security Agreement, the Borrower shall fund a portion of the purchase price through a secured loan made by the Lender. The secured loan will be secured by a first priority perfected security interest in all assets of the Borrower, including the Receivables and the proceeds thereof.

The secured loan will be nonrecourse with respect to defaults by obligors for financial reasons under the Receivables. FairFin will be responsible for all nonpayments due to

*Fair Finance Company, Inc.*                *Page 2*                    *Financing Transaction Proposal*

|  |  |
|---|---|
| | product defects, discounts, adjustments to obligor accounts and other amounts not collected due to nonfinancial reasons. |
| Receivables: | All amounts, rights and payments accruing to FairFin or any assignee in respect of retail installment loans, all security interests in any financed goods and all proceeds thereof. |
| Maximum Amount: | Up to $75,000,000, subject to due diligence. |
| Maturity Date: | Shall mean the earlier of three (3) years or the occurrence of a Termination Event. |
| Borrowing Base: | On any date, the lesser of the (i) Maximum Amount and (ii) the Net Account Balance of all Eligible Receivables on that date minus the sum of (A) the amount of funds in the Reserve Account and (B) the Overcollateralization Amount. |
| Net Account Balance: | The gross balance of each Eligible Receivable less the total of unearned interest and finance charges, unearned purchase discount and reserves for finance credit losses. In no event will the Net Account Balance of any Eligible Receivable exceed 90% of the amount paid to acquire the receivable by FairFin. Discounting may be necessary to the extent receivables are low coupon receivables. |
| Reserve Account: | An amount sufficient to pay three (3) months of interest and servicing costs, subject to due diligence. |

Overcollateralization Amount:  On any date, the amount equal to:
  1) the greatest of:
    (i) five times greatest 3 month rolling average default rate over the previous 12 months multiplied by the Net Account Balance of all Eligible Receivables;
    (ii) the product of:
       a. 100% minus the Advance Rate multiplied by
       b. the Net Account Balance of all Eligible Receivables on that date; and
    (iii) 4% of the Maximum Amount;
  less
  2) the Reserve Account.

| | |
|---|---|
| Advance Rate: | 65%, subject to confirmation by due diligence. |
| Interest Rate: | For the first year after Closing, 16.5% per annum. For the second year after Closing, 15.5% per annum. Thereafter, 14.5% per annum. |
| | Interest Rate shall be payable monthly and calculated based on a 360-day year and the actual number of days elapsed. Interest shall accrue on late payments or after the occurrence of a Termination Event at 500 basis points over the otherwise applicable Interest Rate. |
| Loan Amount: | The total amount of outstanding advances by the Lender, not to exceed the Borrowing Base. |
| Structuring Fee: | 1.50% of each Tranche availability amount. The Structuring Fee associated with the Borrower's first Tranche shall be due and payable on the date of Closing. The Structuring Fee associated with each subsequent Tranche shall be due and payable on the date each respective Tranche is requested by the Borrower. |
| Non-Used Fee: | 35 basis points per year times the Maximum Amount less the Loan Amount, calculated and payable monthly in advance. |

| *Fair Finance Company, Inc.* | *Page 3* | *Financing Transaction Proposal* |
|---|---|---|

| | |
|---|---|
| Security Interest: | The Lender shall be secured by a first priority perfected security interest in the Receivables and related security including the Collections, benefits under certain insurance policies covering purchased goods and all proceeds derived thereunder. |
| Termination Event: | Customary events for a transaction of this nature. To be defined following due diligence. |
| Prepayment: | Each Tranche can not be prepaid for the first 24 months from each closing, respectively. |

**PORTFOLIO DESCRIPTION AND ELIGIBLE RECEIVABLES CRITERIA**

| | |
|---|---|
| Portfolio Description: | The portfolio to be purchased shall be comprised of Eligible Receivables that have been originated by FairFin in accordance with FairFin's standard underwriting and operating procedures, which shall be reviewed and approved by Lender, and shall have been validly assigned by FairFin to Borrower. |
| Concentration Limits: | Documentation will include concentration limits to be negotiated, including limitations based on vendor exposures, maximum contract size, payment terms and other characteristics of the Receivables. |
| Eligibility Criteria: | Documentation will include customary eligibility criteria, revolving accounts will not be eligible, and such eligibility criteria will be determined following due diligence. |

**SERVICING AND CONTRACT FILES**

| | |
|---|---|
| Servicing: | As Servicer, FairFin is required to manage, service, administer, collect and enforce the Contracts on behalf of the Borrower in accordance with a standard not lower than its customary and usual procedures and the standards set forth in its written Credit and Collection Policies, which shall be reviewed and approved by Lender. The Loan Agreement will include servicing provisions that detail the procedures for Receivable collections, including the use of lock-boxes and related control agreements. DC Investment, LLC, Timothy Durham and James Cochran will provide a performance guaranty with respect to all obligations of FairFin and the Borrower under the Transaction Documents (excluding any indemnification for credit losses resulting from obligor defaults due to financial reasons). FairFin may be replaced after the occurrence of a Termination Event. |
| Collections: | FairFin shall maintain a lockbox account under the control of the Lender to which all receipts are directed. |
| Hedging Strategy: | Interest rate hedging strategy to be mutually agreed upon, if applicable. |
| Back-up Servicer: | Lender will identify a suitable third-party to act as back-up servicer. |
| Contract Files: | The Contract Files (the "Contract Files") shall be stamped to reflect the assignment of the Eligible Receivables. Fair Fin will develop an imaging strategy prior to closing. A condition of funding any Eligible Receivable will be delivery of evidence that the Custodian has acknowledged receipt of the applicable Contract Files. |

3.   <u>Financing Documents</u>. Brevet and FairFin hereby agree to use reasonable diligence to commence good faith negotiations in order to execute and deliver a definitive loan agreement and related documentation relating to the Financing Transaction (the "Financing Documents") acceptable to parties hereto. All terms and conditions concerning the Financing Transaction shall be stated in the Financing Documents, including without limitation, representations, warranties, covenants and indemnities that are usual and customary in a transaction of this nature, as well as such other provisions as may be mutually

*Fair Finance Company, Inc.*                    *Page 4*                    *Financing Transaction Proposal*

---

agreed upon between the parties. Subject to the satisfaction of all conditions precedent contained in the Financing Documents, the date of Closing is expected to take place on July 6, 2007 or as soon thereafter as possible. Brevet's obligation to execute, deliver and perform on the Financing Documents is conditioned upon approval under Brevet's credit approval process.

4.  <u>Financing Documents: Representations, Warranties, Covenants and Events of Default.</u>

    a). The Financing Documents will contain representations and warranties customary for transactions of this type, including without limitation, representations and warranties by FairFin and the Borrower as to (i) the accuracy and completeness of information related to FairFin (ii) the accuracy and completeness of FairFin's financial statements for the past three years (including financial statements for the year ended 2006); (iii) disclosure of contracts, commitments and liabilities, direct or contingent for FairFin; (iv) the physical condition, suitability, ownership and absence of liens, claims and other adverse interests with respect to the Collateral; (v) the absence of a material adverse change in the condition (financial or otherwise), business, properties, assets or prospects of FairFin; (vi) absence of pending or threatened material litigation, investigations or other matters affecting the Financing Transaction; (vii) the Borrower and FairFin's compliance with laws and regulations applicable to its business and obtaining all licenses and permits required for its business; (viii) the due incorporation, organization, valid existence, good standing and capitalization of the Borrower and FairFin; (ix) no material tax, environmental, pension or labor contingencies with respect to FairFin; and (x) all necessary corporate and governmental authorizations having been obtained for the Financing Transaction; and (xi) the current and future maintenance and insurance for the Collateral.

    b). The Financing Documents will contain covenants customary for transactions of this type, including, without limitation, covenants by FairFin and Borrower as to (i) delivery of annual and quarterly consolidated financial statements; (ii) maintenance of corporate existence, governmental approvals, material property, insurance coverage, environmental compliance; (iii) restrictions on mergers, acquisitions, capital expenditures, investments and consolidations; (iv) limitation on payment of dividends; (v) restrictions on debt (including contingent obligations) and liens; (vi) compliance with laws, payment of taxes, pension obligations; (vii) transactions with affiliates; (viii) access to records; (ix) requirement to maintain, store and insure the Collateral to standards acceptable to Lender; (x) filing of necessary collateral documents; and (xi) restrictions on alteration of organizational documents.

    c). The Financing Documents will include "events of default" customary for transactions of this type, including, without limitation defaults relating to the following: (i) failure to make required payments; (ii) failure to perform or observe covenants; (iii) incorrect representations and warranties; (iv) cross default/judgment default; (v) bankruptcy/insolvency; or (vi) challenge to the enforceability or validity of the Financing Documents.

5.  <u>Conditions to Closing.</u> The respective obligations of the parties with respect to the Financing Transaction shall be subject to satisfaction of conditions customary to transactions of this type, including without limitation, (a) receipt and approval by Lender of FairFin's 2006 year end accountant reviewed financials and such other financials as requested by Lender; (b) due diligence satisfactory to Lender, in its sole discretion; (c) satisfaction of Lender with the Financing Documents and that it has a first priority perfected security position with respect to all the Collateral; (d) the obtaining of all requisite governmental and other authorizations and consents; (e) approval of the Financing Transaction under Lender's credit approval process; (f) absence of a material adverse change in the condition (financial or otherwise), business, properties, assets or prospects of FairFin and Borrower; (g) absence of pending or threatened material litigation, investigations or other matters affecting FairFin or the Financing Transaction; (h) confirmation that the representations and warranties of FairFin are true and accurate in all respects as of the date of Closing; and (i) appropriate legal opinions of counsel to FairFin and Borrower with respect to the Financing Transaction, in form and substance satisfactory to the Lender.

---

*Fair Finance Company, Inc.*          *Page 5*           *Financing Transaction Proposal*

---

6. **Access to FairFin and Borrower Information.** FairFin and Borrower will diligently support the efforts of Lender in connection with its consideration of the Financing Transaction, and in support thereof, will give Lender and its representatives full access to any personnel and all properties, documents, contracts, books, records and operations of FairFin and Borrower relating to their businesses. FairFin and Borrower will furnish Lender with copies of documents and with such other information as Lender may request.

7. **No Other Offers.** The Borrower has notified Brevet that they have an outstanding offer from Summit Consumer Fund, L.P. ("Competing Buyer") to purchase receivables ~~[redacted]~~. The Borrower has given Brevet a right of first refusal (the "ROFR") to purchase the receivables on the same terms as the Competing Buyer. The ROFR shall expire on June 15, 2007. The ROFR shall stipulate that Brevet has the exclusive right to: (i) acquire the receivables by June 29, 2007; (ii) close the Facility by July 6, 2007; or (iii) close an alternative bridge transaction mutually acceptable to Brevet and FairFin. If Brevet does not elect one of the above options, FairFin may execute a sale to the Competing Buyer with no penalties or fees. Unless the Letter has been terminated in accordance with Section 11 hereof or the exception above, FairFin shall deal exclusively with the Lender with respect to the Financing Transaction. Neither FairFin, its affiliates nor any of its shareholders, directors, officers, employees, agents or representatives, will solicit, encourage or entertain proposals from, or enter into negotiations with, or furnish any information to any other person or entity regarding the possible Financing Transaction or any part or element thereof. FairFin agrees that should it consummate any transaction, in lieu of the Financing Transaction with the Lender, that such transaction would be a violation of the provisions of this Section 7. A violation of this Section 7 will render FairFin liable to Brevet for a break-up fee of $1,500,000 ("Break-Up Fee"). The Break-Up Fee shall be due and payable on the closing date of the third party transaction.

— Insert Addendum A

The terms of this Section 7 shall survive the termination of this Letter.

8. **Expenses.** FairFin shall pay and reimburse Brevet for all of Brevet's costs and expenses incurred in connection with the due diligence, documentation, closing, monitoring and administration / audit of the Financing Transaction contemplated hereby, including Brevet's counsel fees, plus expenses, and all other fees and charges incurred by Brevet, whether or not the Financing Transaction contemplated hereby actually closes.

Upon acceptance and execution of this Letter, FairFin shall immediately advance to Brevet ~~$25,000~~ 50,000 to be applied as an initial deposit against the costs of due diligence ("Due Diligence Expense Deposit"), which funds shall be repaid only to the extent not utilized, whether or not the Financing Transaction proceeds. In addition to the Due Diligence Expense Deposit, upon acceptance and execution of this Letter, FairFin shall immediately pay Brevet a non-refundable work fee in the amount of ~~$50,000~~ 100,000 (the "Due Diligence Work Fee"). FairFin acknowledges and agrees that the Due Diligence Work Fee has been fully earned by Brevet and is not subject, in whole or in part, to refund or rebate in the event the Financing Transaction is not consummated. and legal

After completion of due diligence and confirmation of final terms, FairFin shall immediately advance to Brevet $50,000 to be applied as an initial deposit against the legal costs for documenting the Facility ("Legal Expense Deposit"), which funds shall be repaid only to the extent not utilized, whether or not the Financing Transaction proceeds. In addition to the Legal Expense Deposit, FairFin shall at the same time pay Brevet a non-refundable work fee in the amount of ~~$50,000~~ zero (the "Legal Work Fee"). FairFin acknowledges and agrees that the Legal Work Fee is not subject, in whole or in part, to refund or rebate in the event the Financing Transaction is not consummated.

FairFin has the right to receive a copy of any third-party due diligence reports or opinions issued in connection with this term sheet.

---

*Fair Finance Company, Inc.*  *Page 6*  *Financing Transaction Proposal*

The terms of this Section 8 shall survive the termination of this Letter.

9. [Reserved]

10. Indemnification.

    (a) FairFin agrees to (i) indemnify each Indemnified Party and hold each Indemnified Party harmless against: any and all Losses in any way related to the Receivables (excluding credit recourse for defaulted Receivables unrelated to items (A) through (E) below), the Financing Documents or the transactions contemplated hereby, including, without limitation, (A) any untrue, inaccurate, incomplete or misleading statement contained in any information provided by FairFin, or any omission of a fact required to be stated therein or necessary to make the statements therein, not misleading, (B) any failure of FairFin to perform, or any negligence or misconduct in the performance of, any of its obligations (including its obligations as Servicer) in this letter, (C) the inaccuracy of any representation or warranty by FairFin in this letter or in any certificate, report, information or other document delivered pursuant thereto or in connection therewith, (D) any actual or alleged violations of law, breach of contract or tort by FairFin (including any violations of law in the origination or servicing of any Receivable or any actions by FairFin in its role as Servicer), or (E) any claim, demand, defense, assertion, litigation, action or proceeding brought by a third party or Governmental Authority alleging or relating to any of the foregoing; and (ii) reimburse each Indemnified Party promptly upon demand for any legal or other expenses incurred by them in connection with investigating, preparing for or defending against any such claim, demand, defense, assertion, litigation, action or proceeding as such expenses are incurred. The indemnification obligations of FairFin hereunder shall survive the termination of this letter and shall be in addition to any liability which it may otherwise have.

    (b) As used herein the following terms have the following meanings:

"Indemnified Parties" means Brevet, its affiliates and any of their respective officers, directors, agents, partners, members, shareholders and employees.

"Losses" means any and all claims, losses, liabilities (joint or several), demands, damages, costs, expenses, settlement costs, penalties, fines, forfeitures, judgments, and any other costs, fees and expenses (including legal fees and expenses, defense costs and costs of investigation, preparation and litigation) that any Indemnified Party may sustain or incur. Without limiting the foregoing, the term "Losses" shall include any attorney's fees and expenses and costs of investigation, preparation and litigation incurred by an Indemnified Party in connection with enforcement of any indemnity or other provision of the this letter.

The terms of this Section 10 shall survive the termination of this Letter.

11. Termination. This Letter shall terminate and the parties shall be released from all liabilities and obligations hereunder, except for the obligations contained in Sections 7 through 12 herein, upon the earlier of the following:

    a). the execution and delivery of the Financing Documents;

    b). the receipt by Brevet or FairFin, as the case may be, of a written notice of termination from the other party hereto; *provided that* termination by FairFin pursuant to this clause shall not occur, and such notice shall not be delivered by FairFin, prior to the date that is one hundred and twenty (90) days from the date of this Letter.

12. Representations and Warranties of FairFin. By accepting the provisions of this Letter, FairFin represents and warrants that all information that has or will hereafter be made available to Brevet by it or any of its representatives in connection with the transactions contemplated by this Letter is and will be

© 2007 Brevet Capital Advisors                                *Strictly Proprietary and Confidential*

*Fair Finance Company, Inc.*          Page 7          *Financing Transaction Proposal*

---

complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements were or are made. FairFin further represents and warrants that it has the full power and authority to execute and deliver this Letter and the Financing Documents contemplated herein, and to perform all its obligations hereunder and thereunder. Violation of this Section 12 by FairFin shall entitle Lender to the Break-Up Fee as a liquidated damage in addition to any and all rights and remedies it may have available to it in law and equity. The Breakup Fee shall become immediately due and payable to Brevet upon its written notice to FairFin of the termination of this Letter in accordance with this section.

The terms of this Section 12 shall survive the termination of this Letter.

13. **Miscellaneous.** This Letter may not be amended or modified except in writing signed by each of FairFin and Brevet. FairFin may not assign any of its rights or obligations hereunder without Brevet's prior written consent.

14. **Counterparts.** This Letter may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

15. **Choice of Law/Forum.** This Letter shall be governed by and construed in accordance with the laws of the State of New York. Each of the parties to this Letter submits to the jurisdiction of any state or federal court sitting in the State of New York, in any action or proceeding arising out of or relating to this Letter and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court. Each of the parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other party with respect thereto.

*** THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK *** [initials]

[handwritten addendum:]

Addendum A. Addendum to Brevet Capital Advisors Letter to Fair Finance Company, Inc. Dated June 1, 2007

Section 7 continued: If Brevet executes the RoFR and Fair Fin reasonably believes that Brevet will not be able to close on a transaction with terms and conditions that are acceptable to Fair Fin by July 6, 2007, then Fair Fin will be able to close the transaction currently being offered by the Competing Buyer. If Fair Fin closes such transaction, Fair Fin shall immediately pay to Brevet a reduced Break-Up Fee of $200,000.

The current extension of the Textron Loan Agreement with Fair Fin expires on June 7, 2007. In the event Textron does not extend the Agreement until July 7, 2007 or reduces the availability on the current Line of Credit, then Fair Fin may close the transaction with the Competing Buyer prior to June 15, 2007 without paying any Break-Up Fee to Brevet. If Fair Fin closes the transaction with the Competing Buyer on or after June 15, 2007, Fair Fin will pay Brevet the reduced Break-Up Fee of $200,000.* [initials TSO DM]

© 2007 Brevet Capital Advisors                                    *Strictly Proprietary and Confidential*

*unless FairFin notifies Brevet by Wednesday, June 6, 2007 before 6 PM to cease all work. [initials TSO DM]

| Fair Finance Company, Inc. | Page 8 | Financing Transaction Proposal |

This Letter represents only a proposal and does not constitute a commitment by us. A commitment can only be issued upon the written approval of Lender's credit committee. This Letter is not to be distributed or copied for third parties without the prior written consent of Brevet. If this proposal is acceptable to you, please remit to us $75,000 for use relating to the Due Diligence Expense Deposit and the Due Diligence Work Fee, as described in Section 8 of this Letter.

*[handwritten annotations: "and legal", "150,000", "TSD DM", "750 DM"]*

Please execute this Letter acknowledging your acceptance of the terms hereof and return it to the undersigned. In the event that your executed copy of this Letter and the above referenced deposit are not received by us within five business days of the date hereof, this Letter shall be deemed withdrawn.

We look forward to continuing to work with you to complete this transaction.

Very truly yours,

                                    PCS Advisors, Inc. d/b/a
                                    BREVET CAPITAL ADVISORS

                                    By: *[signature]*
                                    Name: Douglas Monticciolo
                                    Title: Managing Director

ACCEPTED AND AGREED AS OF THE DATE FIRST ABOVE WRITTEN:

FAIR FINANCE COMPANY, INC.

By: *[signature]*
Name:
Title:

Case 1:07-cv-06456-DC    Document 1    Filed 07/16/2007    Page 16 of 17

# Brevet Capital

July 12, 2007

**VIA ELECTRONIC MAIL AND**
**FEDERAL EXPRESS**

Mr. Timothy S. Durham
Mr. Jim Cochran
Fair Finance Company, Inc.
815 East Market Street
Akron, Ohio 44305

    Re:   *Financing Transaction / Letter of Intent dated June 1, 2007*

Dear Tim and Jim:

    I refer to our conversation of last night, in which your representatives, Riderwood Group (Michael Miles and Dan Klausner), indicated that you intend to proceed with a transaction in lieu of the Financing Transaction outlined in the letter of intent ("Letter") between Fair Finance Company, Inc. and/or its subsidiaries and affiliates (collectively "FairFin") and Brevet Capital Advisors, and/or its affiliates, partners or assigns (collectively "Brevet"). As you know, such a transaction would violate Brevet's exclusive rights under the Letter.

    Please confirm your intent, in writing, by the close of business on Friday, July 13, 2007. Should you choose to proceed with another transaction in lieu of the Financing Transaction, Brevet hereby demands immediate payment of the $1,500,000 Break-Up-Fee due it under paragraph 7 of the Letter as well as its costs and expenses under paragraph 8 of the Letter. Should you wish to proceed with the Financing Transaction as contemplated in the Letter, Brevet has been and remains ready, willing and able to proceed.

    Brevet reserves all of its rights in law and in equity including its right to seek immediate judicial intervention to protect its rights.

Very truly yours,

Paul Iacovacci
Managing Director

cc:    Roger E. Barton, Esq.