**BARTON BARTON & PLOTKIN LLP**
420 Lexington Avenue
New York, NY 10170
(212) 687-6262
*Attorneys for Plaintiff*
Roger E. Barton (RB 4142)
Randall L. Rasey (RR 2973)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FCS ADVISORS, INC. d/b/a BREVET CAPITAL ADVISORS,<br><br>                    Plaintiff,<br><br>     -against-<br><br>FAIR FINANCE COMPANY, INC.,<br><br>                   Defendant. | 07 CIV 6456 (DC)<br><br><br>**AMENDED COMPLAINT** |

Plaintiff FCS Advisors, Inc. d/b/a Brevet Capital Advisors (FCS Advisors, Inc. d/b/a Brevet Capital Advisors and/or its subsidiaries and affiliates are referred to herein as "Brevet"), by its attorneys Barton Barton & Plotkin LLP, as and for its complaint against defendant Fair Finance Company, Inc. (Fair Finance Company, Inc. and/or its subsidiaries and affiliates referred to as "FairFin"), alleges as follows:

**INTRODUCTION**

1.     Brevet brings this action to recover damages from FairFin for breaching a binding letter of intent regarding a potential financing transaction between them. Pursuant to the letter of intent, FairFin agreed to work exclusively with Brevet toward closing the financing transaction, and to pay Brevet a "Break-Up Fee" of $1.5 million if it breached that agreement and closed a financing transaction with another party in lieu of the contemplated transaction with Brevet. FairFin further agreed to reimburse Brevet for its due diligence expenses and other expenses

incurred in connection with the contemplated financing transaction, including Brevet's counsel fees, regardless of whether the parties actually closed a financing transaction.

      2.      FairFin breached its obligation to deal exclusively with Brevet, and eventually closed financing transactions with third parties in lieu of the contemplated financing transaction with Brevet. Nevertheless, FairFin has failed and refused to pay Brevet the $1.5 million Break-Up Fee and other amounts owed pursuant to the letter of intent, giving rise to this action.

## PARTIES

      3.      Plaintiff Brevet is, and at all times hereinafter mentioned was, a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 666 Third Avenue, 29th Floor, New York, New York 10017.

      4.      Defendant FairFin is, and at all times hereinafter mentioned was, a corporation duly organized and existing under the laws of the State of Ohio, with its principal place of business located at 815 East Market Street, Akron, Ohio 44305.

## JURISDICTION AND VENUE

      5.      This Court has jurisdiction over the subject matter of plaintiff's claims pursuant to 28 U.S.C. § 1332, in that complete diversity exists between plaintiff and defendant, and the matter in controversy, exclusive of interest and costs, exceeds $75,000 in value.

      6.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §1391(a), in that defendant consented to the forum of the state and federal courts in the State of New York for the resolution of all disputes between the parties under the agreement that is the subject of this action.

## FACTUAL BACKGROUND

7.      In or around May 2007, FairFin had a substantial financing arrangement with non-party Textron Financial Corporation (the "Textron Financing") which was to expire on July 7, 2007, and FairFin needed another financing arrangement to replace the Textron Financing.

8.      Brevet was interested in providing FairFin the financing it needed, and Brevet and FairFin began discussing and negotiating the terms of a possible financing transaction between them.

9.      Pursuant to those discussions, Brevet and FairFin entered into a letter of intent dated June 1, 2007 (the "Letter") confirming their mutual interest in consummating a financing transaction of up to $75,000,000 (the "Financing Transaction") to be structured as an asset-backed senior secured loan facility (the "Facility"). (A true and accurate copy of the Letter is annexed hereto as Exhibit A.)

10.     As set forth in the Letter, in exchange for Brevet's commitment to conduct the necessary due diligence and to continue negotiations with FairFin, FairFin promised to work exclusively with Brevet to close the anticipated Financing Transaction, and agreed, among other things, to pay Brevet a substantial penalty, in the form of a $1.5 million "Break-Up Fee", if FairFin instead pursued and closed a financing transaction with someone else.

### Relevant Terms of the Letter

11.     Pursuant to Section 11 of the Letter, the Letter would terminate upon the earlier of (i) the closing of the Financing Transaction, or (ii) no sooner than 120 days after the date of the Letter upon receipt of written notice of termination by either party from the other.

12.     The parties expressly agreed that if the Letter terminated, they would still be bound by certain provisions of the Letter:

> This Letter is intended solely as a basis for further discussion and is not intended to be and does not constitute a legally binding agreement;

- 3 -

> provided, however, that the provisions set forth in Sections 6 through 12 below shall be binding on the parties hereto and Sections 7 through 12 shall survive the termination hereof and of any discussions relating to the Financing Transaction among the parties hereto.

(Letter, p. 1(emphasis supplied).)

13.    The parties expressly acknowledged in the Letter that FairFin had an existing offer for it to obtain interim financing through a sale of its accounts receivable (a "receivables purchase") from Summit Consumer Fund, L.P. and/or its affiliates ("Summit"). (*See* Letter, §7.)

14.    Upon information and belief, the receivables purchase offered by Summit was insufficient to sustain FairFin over the long term after the Textron Financing expired, and, therefore, if FairFin accepted the receivables purchase offer from Summit, it would still need to obtain substantial additional financing.

15.    As set forth in Section 7 of the Letter, FairFin granted Brevet a right of first refusal ("ROFR") to (i) purchase FairFin's receivables on the same terms offered by Summit, by June 29, 2007; (ii) close the entire Facility by July 6, 2007; or (iii) close an alternative, mutually acceptable bridge financing transaction.

16.    Brevet was required to notify FairFin by June 15, 2007, that Brevet would exercise the ROFR.

17.    Pursuant to Section 7 of the Letter, FairFin expressly agreed to deal exclusively with Brevet regarding the financing contemplated in the Letter:

> FairFin shall deal exclusively with the Lender [Brevet] with respect to the Financing Transaction.  Neither FairFin, its affiliates nor any of its shareholders, directors, officers, employees, agents or representatives, will solicit, encourage or entertain proposals from, or enter into negotiations with, or furnish any information to any other person or entity regarding the possible Financing Transaction or any part or element thereof.   FairFin agrees that should it consummate any transaction, in lieu of the Financing Transaction with the Lender [Brevet], that such transaction would be a violation of the provisions of this Section 7.

- 4 -

(emphasis supplied.)

18.    Pursuant to Section 7 of the Letter, the only circumstances in which FairFin would be permitted to deal with any other party regarding possible financing was if (i) Brevet failed to exercise the ROFR, or (ii) the Letter were terminated as provided in Section 11 of the Letter (*i.e.*, by written notice no sooner than 120 days after June 1, 2007). (*See* Letter, § 7.)

19.    On or about June 13, 2007, Brevet timely notified FairFin, in writing, that it would exercise its option under the ROFR to close the Facility by July 6, 2007.

20.    Neither Brevet nor FairFin ever served a written notice of termination of the Letter on the other party.

21.    FairFin expressly agreed to pay Brevet a "Break-Up Fee" of $1.5 million if FairFin violated Section 7 of the Letter and closed a financing transaction with another lender instead of Brevet:

> A violation of this Section 7, will render FairFin liable to Brevet for a break-up-fee of $1,500,000 ("Break-Up-Fee"). The Break-Up-Fee shall be due and payable on the closing date of the third party transaction.

(Letter, § 7.)

22.    The parties further agreed, however, that, if FairFin "reasonably" determined that Brevet was unable to provide financing on terms acceptable to FairFin by July 6, 2007 – which was the day before the Textron Financing was to expire – then FairFin could accept the outstanding receivables purchase offer from Summit, close the rest of the Financing Transaction with Brevet, and pay Brevet a "reduced Break-Up Fee" of $200,000:

> If Brevet executes the ROFR and FairFin reasonably believes that Brevet will not be able to close on a transaction with terms and conditions acceptable to FairFin by July 6, 2007, then FairFin will be able to close the transaction currently being offered by the Competing Buyer [Summit]. If FairFin closes such transaction, FairFin shall immediately pay to Brevet a reduced Break-Up Fee of $200,000.

(Letter, § 7, Addendum A.)

23.    In addition, FairFin agreed to reimburse Brevet for its expenses related to the contemplated Financing Transaction, regardless of whether the Financing Transaction ever closed:

> FairFin shall pay and reimburse Brevet for all of Brevet's costs and expenses incurred in connection with the due diligence, documentation, closing, monitoring and administration / audit of the Financing Transaction contemplated hereby, including Brevet's counsel fees, plus expenses, and all other fees and charges incurred by Brevet, whether or not the Financing Transaction contemplated hereby actually closes.

(Letter, § 8.)

### FairFin's Violations of Section 7 of the Letter

24.    Although Brevet timely exercised the ROFR and was, at all relevant times, ready, willing, and able to close the Financing Transaction by July 6, 2007, FairFin breached its obligation to deal exclusively with Brevet, and, instead, pursued and consummated a two-stage financing transaction with Summit and Fortress Credit Corp. and/or its affiliates ("Fortress").

25.    Pursuant to Section 7 of the Letter, FairFin was required to deal exclusively with Brevet to obtain financing unless either Brevet failed to exercise the ROFR, or either party deliver a written notice of termination of the Letter to the other party no sooner than 120 days after June 1, 2007.

26.    Brevet timely executed the ROFR, and neither Brevet nor FairFin ever delivered a written notice of termination of the Letter to the other party; therefore, FairFin was, at all relevant times, required to deal exclusively with Brevet to obtain financing.

27.    Throughout June and early July 2007, Brevet, in reliance upon FairFin's promises and obligations pursuant to the Letter, continued to conduct the necessary due diligence for the Financing Transaction and to work with FairFin in good faith to close the Financing Transaction.

28.    In or around late June 2007, FairFin represented to Brevet that it would be unable to close on the Financing Transaction by July 6, 2007, and sought Brevet's help in obtaining an extension of the Textron Financing.

29.    With Brevet's help, FairFin received an extension of the expiration date of the Textron Financing from July 7 to July 20, 2007.

30.    As a result of the extension of the Textron Financing, Brevet and FairFin discussed and worked toward a new closing date of July 20, 2007.

31.    On June 27, 2007, FairFin again notified Brevet, in writing, that "we have selected and intend to close on the transaction" between FairFin and Brevet.

32.    Upon information and belief, unbeknownst at that time to Brevet, in late June and early July 2007, FairFin was soliciting, encouraging, and entertaining proposals from, and/or entering into negotiations with other lenders, including, but not limited to, Fortress and Summit, to provide financing to FairFin in lieu of all or part of the contemplated Financing Transaction with Brevet.

33.    In particular, FairFin discussed and pursued with Fortress and Summit a two-stage financing transaction, whereby Fortress would provide funding for the initial receivables purchase transaction with Summit, and would later provide a larger revolving credit facility to FairFin.

34.    FairFin's ongoing discussions and pursuit of the two-stage financing transaction with Fortress and Summit violated its express obligations under Section 7 of the Letter to "deal exclusively with" Brevet regarding the financing.

35.    In addition to the two-stage financing transaction with Fortress and Summit, FairFin pursued proposals from other potential lenders, in violation of its express obligations under Section 7 of the Letter to "deal exclusively with" Brevet regarding the financing.

36.    For example, upon information and belief, in or around early July 2007, FairFin also continued to pursue financing from a local equity group known as M&H Equity, with which FairFin had first discussed financing several months earlier.

37.    Upon further information and belief, the financing which FairFin pursued with M&H Equity was to be in lieu of the Financing Transaction with Brevet, and an alternative to the financing which FairFin was pursuing with Fortress and Summit.

38.    On July 11, 2007, The Riderwood Group, which represented FairFin as its broker with respect to the contemplated financing, told Brevet that FairFin intended to proceed to obtain financing from a different lender in lieu of the Financing Transaction with Brevet.

39.    By letter dated and delivered to FairFin on July 12, 2007, Brevet advised FairFin that if it proceeded with a transaction with a different lender in lieu of the Financing Transaction, FairFin would owe Brevet the $1,500,000 Break-Up-Fee under Section 7 of the Letter, in addition to Brevet's costs and expenses under Section 8 of the Letter. (A true and accurate copy of Brevet's July 12, 2007 letter to FairFin is annexed hereto as Exhibit B.)

40.    In that same letter of July 12, 2007, Brevet also told FairFin "should you [FairFin] wish to proceed with the Financing Transaction as contemplated in the Letter, Brevet has been and remains ready, willing and able to proceed."

41.    The next day, July 13, 2007, FairFin sent Summit a letter stating that, "[a]t this time", FairFin was declining Summit's offer of a "Warehouse Line of Credit", which FairFin stated was "separate from" the receivables purchase transaction which FairFin intended to close with Summit by July 20, 2007.

42.    Also on July 13, 2007, FairFin, through its counsel, sent Brevet a letter in which they denied that FairFin owed Brevet the $1,500,000 Break-Up-Fee, but did not deny that

FairFin had been pursuing and intended to proceed with a different transaction in lieu of the Financing Transaction with Brevet.

43.    Upon information and belief, FairFin thereafter continued to pursue Summit's Warehouse Line of Credit offer, which, in fact, was to be funded by Fortress and was the second part of the contemplated two-stage financing transaction with Fortress and Summit.

44.    On or about July 20, 2007, FairFin consummated the receivables purchase transaction with Fortress and Summit.

45.    Upon information and belief, Summit, with financing from Fortress, purchased FairFin's receivables for around $22 million.

46.    FairFin closed the receivables purchase transaction with Fortress and Summit even though FairFin had never had any reasonable basis to believe that Brevet was unable to close a Financing Transaction by July 6, 2007.

47.    FairFin never tendered the $200,000 reduced Break-Up Fee that it was required to pay to Brevet under Section 7 of the Letter in the event FairFin "reasonably believe[d]" Brevet was unable to close a transaction by July 6, 2007 and closed the receivables purchase transaction with Summit.

48.    Upon information and belief, on or about February 12, 2008, Fair consummated the larger credit facility with Fortress and Summit.

49.    Upon information and belief, the transaction between FairFin, Fortress, and Summit which closed in February 2008 was structured as an asset-backed senior secured loan facility of up to $50 million.

50.    Upon information and belief, FairFin pursued and closed the receivables purchase transaction with Fortress and Summit in July 2007, and the larger loan facility with Fortress and Summit in February 2008, in lieu of the contemplated Financing Transaction with Brevet.

51.     FairFin's pursuit of financing from lenders other than Brevet after June 1, 2007, and its closings of the financing transactions with Fortress and Summit, violated Section 7 of the Letter, and, therefore, FairFin was and is required to pay the $1.5 million Break-Up Fee to Brevet.

### FIRST CLAIM FOR RELIEF
### FOR BREACH OF CONTRACT

52.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 51 contained hereof, with the same force and effect as if set forth fully at length herein.

53.     The Letter constitutes a valid, enforceable, and binding contract between FairFin and Brevet.

54.     Pursuant to Section 7 of the Letter, FairFin, in exchange for valuable consideration from Brevet, agreed that it would not "solicit, encourage or entertain proposals from, or enter into negotiations with, or furnish any information to any other person or entity regarding the possible Financing Transaction or any part or element thereof."

55.     Pursuant to Section 7 of the Letter, FairFin, in exchange for valuable consideration from Brevet, agreed that FairFin's consummation of any transaction in lieu of the contemplated Financing Transaction with Brevet would violate Section 7 of the Letter.

56.     Pursuant to Section 7 of the Letter, FairFin, in exchange for valuable consideration from Brevet, agreed that if it violated Section 7 of the Letter it would be liable to Brevet for a "Break-Up Fee" in the sum of $1,500,000, which sum would be due and owing upon FairFin's closing of a transaction with a third party in lieu of the Financing Transaction with Brevet.

57.     FairFin solicited, encouraged, and/or entertained proposals from, entered into negotiations with, and furnished information to, other persons and entities regarding financing, in violation of Section 7 of the Letter.

58.    On or about July 20, 2007, FairFin closed the Summit Transaction, which was, in whole or in part, in lieu of the Financing Transaction with Brevet.

59.    On or around February 12, 2008, FairFin closed the Fortress Transaction, which was, in whole or in part, in lieu of the Financing Transaction with Brevet.

60.    Upon information and belief, FairFin closed one or more other third-party financing transactions in lieu of the Financing Transactions, the dates of and parties to which are presently unknown to Brevet.

61.    Brevet performed all necessary conditions precedent pursuant to the Letter.

62.    By reason of the foregoing, FairFin was and is required to pay Brevet the sum of $1,500,000, which sum was due and owing as of the date(s) of the closings of the relevant transactions.

63.    FairFin has failed and refused to pay said sum to Brevet, despite Brevet's demands therefor.

64.    By reason of the foregoing, Brevet has been damaged in an amount to be determined at trial, but not less than $1,500,000.

## SECOND CLAIM FOR RELIEF
## FOR BREACH OF CONTRACT

65.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 64 contained hereof, with the same force and effect as if set forth fully at length herein.

66.    The Letter constitutes a valid, enforceable, and binding contract between FairFin and Brevet.

67.    Pursuant to the Letter, FairFin, in exchange for valuable consideration from Brevet, agreed that if it closed the referenced receivables purchase transaction with Summit, FairFin was required to pay Brevet a "Break-Up Fee" of at least $200,000.

68.     On or about July 20, 2007, FairFin closed a receivables purchase transaction with Summit.

69.     Brevet performed all necessary conditions precedent pursuant to the Letter.

70.     By reason of the foregoing, FairFin was and is required to pay Brevet a sum of at least $200,000, which sum was due and owing as of July 20, 2007.

71.     FairFin has failed and refused to pay said sum to Brevet, despite Brevet's demands therefor.

72.     By reason of the foregoing, Brevet has been damaged in an amount to be determined at trial, but not less than $200,000.

### THIRD CLAIM FOR RELIEF
### FOR BREACH OF IMPLIED DUTY
### OF GOOD FAITH AND FAIR DEALING

73.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 72 contained hereof, with the same force and effect as if set forth fully at length herein.

74.     The Letter constitutes a valid, enforceable, and binding contract between FairFin and Brevet.

75.     Under the Letter, FairFin owed Brevet an implied duty of good faith and fair dealing separate and independent of FairFin's duties and obligations under the express terms of the Letter.

76.     FairFin breached its duty of good faith and fair dealing by, among other things, failing to deal with Brevet in good faith to negotiate and close the Financing Transaction in a timely manner.

77.     As a result thereof, Brevet and FairFin did not close the Financing Transaction, and FairFin closed other transactions with other lenders in lieu of the Financing Transaction with Brevet.

78.     By reason of the foregoing, Brevet has been damaged in an amount to be determined at trial, but not less than $1,500,000.

## FOURTH CLAIM FOR RELIEF
## FOR BREACH OF CONTRACT

79.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 78 contained hereof, with the same force and effect as if set forth fully at length herein.

80.     The Letter constitutes a valid, enforceable, and binding contract between FairFin and Brevet.

81.     Pursuant to Section 8 the Letter, FairFin, in exchange for valuable consideration from Brevet, agreed to pay and reimburse Brevet for all of its costs and expenses incurred in connection with the due diligence, documentation, closing, monitoring, administration, and audit of the Financing Transaction, including Brevet's counsel fees, expenses, and all other fees and charges incurred by Brevet, regardless of whether the Financing Transaction closed.

82.     Brevet incurred substantial costs and expenses, including counsel fees, in connection with the Financing Transaction, which costs and expenses FairFin has failed and refused to reimburse and to pay, despite Brevet's demand therefor.

83.     By reason of the foregoing, Brevet has been damaged in an amount to be determined at trial.

**WHEREFORE**, plaintiff Brevet prays for judgment against FairFin, as follows:

a.      On the First Claim for Relief, awarding Brevet damages in an amount of no less than $1,500,000;

b.      On the Second Claim for Relief, awarding Brevet damages in the amount of $200,000;

c.    On the Third Claim for Relief, awarding Brevet damages in an amount of no less than $1,500,000;

d.    On the Fourth Claim for Relief, awarding Brevet damages in the amount of its unpaid and/or unreimbursed costs and expenses incurred in connection with the Financing Transaction, including its counsel fees incurred herewith;

e.    Awarding Brevet interest, costs, and expenses as provided by law; and

f.    Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
       May 23, 2008

**BARTON BARTON & PLOTKIN LLP**

By: _____
    Roger E. Barton (RB 4142)
    Randall L. Rasey (RR 2973)
    *Attorneys for Plaintiff*
    420 Lexington Avenue, 18th Floor
    New York, NY  10170
    *Tel:*    (212) 687-6262
    *Fax:*    (212) 687-3667
    *Email:* rbarton@bartonesq.com
             rrasey@bartonesq.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 23rd day of May, 2008, a true and accurate copy of the foregoing PLAINTIFF'S AMENDED COMPLAINT was served within the time permitted by the court rules *via* Email and First Class Mail for delivery to the following addressee(s):

**Ira N. Glauber, Esq.**
Jaffe & Asher LLP
600 Third Avenue
New York, NY 10016
IGlauber@jaffeandasher.com


Dated: 5/23/08 _____    Signature: _____