UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x
                                      :
FCS ADVISORS, INC. d/b/a BREVET
CAPITAL ADVISORS,                     :

                Plaintiff,            :

          - against -                 :

FAIR FINANCE COMPANY, INC.,           :

                Defendant.            :

- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-19-09

**OPINION**

07 Civ. 6456 (DC)

**APPEARANCES:**     BARTON BARTON & PLOTKIN LLP
                     Attorneys for Plaintiff
                          By:  Roger E. Barton, Esq.
                               Randall L. Rasey, Esq.
                     420 Lexington Avenue, 18th Floor
                     New York, New York  10170

                     JAFFE & ASHER LLP
                     Attorneys for Defendant
                          By:  Gregory E. Galterio, Esq.
                               Ira N. Glauber, Esq.
                     600 Third Avenue
                     New York, New York  10016

**CHIN, District Judge**

          On June 1, 2007, plaintiff FCS Advisors, Inc. d/b/a

Brevet Capital Advisors ("Brevet") and defendant Fair Finance

Company, Inc. ("FairFin") signed a Letter of Intent (the "LOI")

reflecting their agreement to consider a transaction pursuant to

which Brevet would provide FairFin with up to $75 million in

financing.  While certain aspects of the LOI were expressly non-

binding, certain provisions were expressly binding, including one

requiring FairFin to deal exclusively with Brevet vis-a-vis the

financing.  That same provision required FairFin to pay Brevet a

$1.5 million break-up fee if FairFin closed a financing with
another party "in lieu of" the financing contemplated in the LOI.

The transaction between Brevet and FairFin never
closed.  During the course of negotiations, Brevet learned that
FairFin had been negotiating with another party for financing
similar to that which Brevet was considering providing under the
LOI.  FairFin ultimately closed that transaction.  Brevet sued
for the break-up fee and due diligence expenses it claims it is
owed under the LOI.

Both parties move for summary judgment.  For the
reasons set forth below, I conclude that Brevet is entitled to
due diligence expenses in the amount of $31,371.75 as well as the
$1.5 million break-up fee.

**BACKGROUND**

## A.  Facts

The facts are largely undisputed, and conflicts in the
evidence have been resolved in favor of FairFin.  The following
facts are drawn from the deposition transcripts, affidavits,
declarations, and exhibits:

### 1.  The Parties

Brevet, a corporation based in New York City, manages a
hedge fund that had over $100 million to invest in 2007, when the
events giving rise to this suit took place. (Pl. Statement ¶ 1).

---

[1]     Unless otherwise noted, the Court cites Brevet's Rule
56.1 statement only for facts that FairFin admitted.

FairFin is an Ohio corporation based in Akron. (Id. ¶ 4). FairFin's business consists primarily of providing financing to retail stores by purchasing their receivables. (Id. ¶¶ 4-5).

## 2. **FairFin's Deal with Brevet**

In the spring of 2007 FairFin was looking to raise capital to refinance a loan it had with Textron Financial Corporation ("Textron"). (Id. ¶ 9; Durham 10/9/08 Aff. ¶ 2). The loan, totaling approximately $23 million, had to be repaid by July 7, 2007. (Id.). FairFin had already negotiated with Summit Consumer Fund, L.P. ("Summit") for Summit to purchase approximately $23 million in FairFin's account receivables. (Pl. Statement ¶ 10; Barton Decl. Ex. 10 (agreement between Summit and FairFin)). Summit was going to receive financing for the receivables purchase from Fortress Financing Corporation ("Fortress"), a hedge fund that was Brevet's competitor. (Durham 11/6/08 Aff. ¶ 45; Callahan Decl. ¶ 20).

The deal with Summit was not ideal for FairFin, however, because it would only resolve FairFin's loan from Textron and would not provide any financing going forward. (Durham 11/6/08 Aff. ¶ 8 (stating that "a line of credit was preferable to selling assets as a way of raising financing")). To secure a longer-term deal, FairFin and Brevet -- which had been introduced by an intermediary -- began discussing a possible deal by which Brevet would provide FairFin with up to $75 million in financing. (Durham 10/9/08 Aff. ¶ 2; Pl. Statement ¶ 13). During the course of the ensuing negotiations, FairFin disclosed

to Brevet the existence of the Summit deal, and the fact that
Fortress was financing it.  (Callahan Decl. ¶ 17; Durham 11/6/08
Aff. Ex. B at 2).  On May 3, 2007, Brevet sent a letter to
FairFin outlining, in broad strokes, its proposal. (Barton Decl.
Ex. 40).  On June 1, 2007, Brevet and FairFin signed the LOI.
(Barton Decl. Ex. 4).  The LOI contemplated a transaction in
which Brevet would provide FairFin with up to $75 million in
financing in the form of an asset-backed loan for up to three
years.  (LOI at 1).  That transaction is defined in the LOI as
the "Financing Transaction."  (Id.)

       The LOI expressly provides that it is not a legally
binding contract except for sections 6 through 12.  (LOI at 1).
The operative provision in this case is Section 7, which reads in
full as follows:

> The Borrower [an entity to be created by
> FairFin] has notified Brevet that they [sic]
> have an outstanding offer from Summit
> Consumer Fund, L.P. ("Competing Buyer") to
> purchase receivables [redacted text].  The
> Borrower has given Brevet a right of first
> refusal (the "ROFR") to purchase the
> receivables on the same terms as the
> Competing Buyer.  The ROFR shall expire on
> June 15, 2007.  The ROFR shall stipulate that
> Brevet has the exclusive right to:  (i)
> acquire the receivables by June 29, 2007;
> (ii) close the Facility by July 6, 2007; or
> (iii) close an alternative bridge transaction
> mutually acceptable to Brevet and FairFin.
> If Brevet does not elect one of the above
> options, FairFin may execute a sale to the
> Competing Buyer with no penalties or fees.
> Unless the [LOI] has been terminated in
> accordance with Section 11 hereof or the
> exception above, FairFin shall deal
> exclusively with [Brevet] with respect to the
> Financing Transaction.  Neither FairFin, its
> affiliates nor any of its shareholders,

> directors, officers, employees, agents or
> representatives, will solicit, encourage or
> entertain proposals from, or enter into
> negotiations with, or furnish any information
> to any other person or entity regarding the
> possible Financing Transaction or any part or
> element thereof.  FairFin agrees that should
> it consummate any transaction, in lieu of the
> Financing Transaction with [Brevet], that
> such transaction would be a violation of the
> provisions of this Section 7.  A violation of
> this Section 7 will render FairFin liable to
> Brevet for a break-up fee of $1,500,000
> ("Break-Up Fee").  The Break-Up Fee shall be
> due and payable on the closing date of the
> third-party transaction.
>
> **The terms of this Section 7 shall survive the
> termination of this Letter.**

(Emphasis in original).  Section 7, in other words, did two

things:  First, it gave Brevet an option (or ROFR) to proceed

with any one of three transactions with FairFin by informing

FairFin by June 15, 2007.  Second, if Brevet elected to proceed

with a transaction, Section 7 required FairFin to deal

exclusively with Brevet.  By its terms, the exclusivity provision

was strict, and prohibited FairFin from soliciting, encouraging,

or entertaining proposals from another party regarding the

Financing Transaction.

       The LOI also contains a handwritten addendum to Section

7, initialed by both parties,[2] that provides, in relevant part,

as follows:

> If Brevet executes the ROFR and FairFin
> reasonably believes that Brevet will not be
> able to close on a transaction with terms and

---

[2]     Neither party argues that the handwritten addendum is
not legally binding.

> conditions that are acceptable to FairFin by
> July 6, 2007, then FairFin will be able to
> close the Transaction currently being offered
> by the Competing Buyer [Summit].  If FairFin
> closes such transaction, FairFin shall
> immediately pay to Brevet a reduced Break-Up
> Fee of $200,000.

(LOI at 7).

The LOI would only terminate upon execution of a deal
between the parties, or upon receipt of a written notice of
termination by either party.  (LOI § 11).  FairFin was not
permitted to unilaterally terminate the deal, however, within 120
days of the LOI's execution.  (Id.).

Under the LOI, FairFin also agreed to reimburse Brevet
for all expenses incurred while performing the due diligence
required under the LOI, and it advanced Brevet $50,000.  (Durham
10/9/08 Aff. ¶ 3; LOI § 8).

Immediately after the LOI was signed, Brevet began
conducting due diligence on FairFin, and negotiating the terms of
the loan.  (Pl. Statement ¶¶ 21-22; Callahan Decl. ¶¶ 15-17).  On
June 14, 2007 Brevet sent a letter to FairFin that read, in
relevant part, as follows:

> As we previously discussed, you wanted us to
> respond to you by June 15 in order to confirm
> our continuing interest in the proposed
> financing.  This message is to inform you
> that, as of today, we intend to move forward
> with the proposed transaction on the terms
> and conditions previously discussed.  As a
> result, we have hired Mayer, Brown, Rowe &
> Maw LLP, and have begun drafting
> documentation with the goal of sending you a
> draft set by mid next week and closing by
> July 6.

(Durham 10/9/08 Aff. Ex. H).  The subject line of this letter

read, "Proceeding with Financing Transaction."  (Id.).  It was
clear, then, that Brevet was proceeding with the $75 million
financing transaction.

     The parties proceeded with negotiations with the goal
of closing the transaction by July 6, 2007.  Brevet had seven
people working "nearly full-time" on the deal.  (Callahan Decl. ¶
35).  On June 24, 2007, Brevet emailed FairFin a draft loan and
servicing agreement and reiterated its commitment to the deal,
writing that Brevet was "confident that we can close this
transaction within the time constraints of Textron" and that its
team was "prepared to work seven days a week with your team to
hammer out the operational and mechanical aspects of this
transaction and close on time."  (Barton Decl. Ex. 41).  Perhaps
reflecting rumors Brevet was hearing indicating that FairFin was
attempting to secure financing from Fortress (Callahan Decl. ¶
38), the email also indicated that it was "critical" to Brevet
that FairFin exclusively negotiate with Brevet vis-a-vis the
financing.  (Barton Decl. Ex. 41).

     The parties continued to negotiate, and scheduled a
conference call for July 3, 2007 to resolve "the few remaining
open issues."  (Callahan Decl. ¶ 40; Barton Decl. Ex. 15).  On
July 5, 2007 -- one day before the transaction was to close --
FairFin emailed Brevet to inform it that FairFin's counsel needed
additional time to issue a legal opinion.  (Barton Decl. Ex. 16).
Brevet responded to this email eleven minutes later to ask for a
list of what FairFin considered to be open items so that they

- 7 -

could be addressed as soon as possible.  (Id.).  That same day,
FairFin informed Brevet that Textron had agreed to extend the due
date for repayment of its loan to July 20, 2007.  (Callahan Decl.
¶ 42).

On July 9, 2007, Brevet learned that FairFin's counsel
was prepared to issue its opinion letter.  (Durham 11/6/08 Aff.
Ex. A).  The transaction never closed, however, and on July 11,
2007, FairFin, through an intermediary, informed Brevet that it
was not going to proceed with the Financing Transaction.
(Callahan Decl. ¶ 44).  The next day, Brevet sent a letter to
FairFin stating that Brevet "remains ready, willing and able to
proceed" with the transaction, and that if FairFin chose not to
proceed with the transaction, it would be obligated to pay Brevet
the $1.5 million break-up fee.  (Barton Decl. Ex. 17).

On July 20, 2007, FairFin closed a transaction with
Summit for the purchase of $23 million in FairFin's receivables.
(Id. Ex. 38).

### 3.   **FairFin's Contacts with Summit Regarding a Line of Credit**

According to Wayne Crane, an executive vice president
at Summit, in June 2007 Summit and Fortress began discussions
about jointly offering FairFin what is called a warehouse line of
credit.  (Crane Dep. at 39-40).[3]  Summit contacted FairFin's CEO

---

[3]     According to Crane, a warehouse line of credit is a
"secured revolving facility whereby the borrower pledges certain
assets to the lender and can borrow against those assets on some
formulaic basis."  (Id. at 40).

in "very late June 2007," and at that time they discussed the line of credit.  (Durham 11/6/08 Aff. ¶ 51).  FairFin never had any direct discussions with Fortress about the line of credit. (Id. ¶ 52).

On June 19, 2007, a senior vice president of Textron emailed FairFin's CEO and CFO the following:  "The Fortress people ask me to consider extending the facility beyond 7/7/07 because of documentation.  I indicated to them that for the right reasons I would.  Are you still closing ASAP with the smaller Summit facility and closing later on the larger facility that includes Fortress or am I missing something here?"  (Barton Decl. Ex. 18).

On June 28, 2007, Summit sent an email to FairFin's CEO, COO, and CFO indicating that Summit was interested in providing FairFin with a "Warehouse Line of Credit after the completion of this transaction."  (Barton Decl. Ex. 19).  A conference call was scheduled that next day to discuss the line of credit.  (Id. Ex. 20).

On July 2, 2007, FairFin's CFO emailed Summit and wrote as follows:  "As we discussed I think it is very important for Tim [FairFin CEO] and Jim [FairFin COO] to see the Warehouse term sheet this week so they can determine their long-term financing strategy."  (Id. Ex. 21).  On July 5, 2007, the President of FairFin emailed the CEO, COO, and CFO that Summit "would have a term sheet to us Monday for the Warehouse Line."  (Id. Ex. 23).

- 9 -

According to FairFin's CEO, he never saw the term sheet.  (Durham 11/6/08 Aff. ¶ 53).

On July 7, 2007, FairFin's CEO emailed Summit the following:

> [W]e have been running several alternative paths.  2 are sitting in reserve as they are not great long term deals.  frankly the other one we are also close to finishing as well had a more attractive structure in that they offered a loc which seemed to be more flexible than the sale off of assets every month.  but when you mentioned the availability of the floor line, your option became potentially more attractive.  so that is why we want to see an out line of the structure.  we are still moving forward in getting the sale docs done and if the structure is as you have said (with a more detail provided) I can confidently tell you we would do your deal asap.  we may do it anyway but it sue pushes ove the hump.

(Id. Ex. 24 (all errors in original)).

On July 13, 2007, FairFin's CEO sent the following letter to Summit:  "Fair Finance is please[d] that you are considering offering a Warehouse Line of Credit which is separate from our current transaction which is scheduled to close on or before July 20, 2007.  At this time we respectfully decline additional financing . . . ."  (Id. Ex. 26).  In October of that year, however, FairFin contacted Summit and told Summit that it was "ready to proceed with the line of credit."  (Crane Dep. at 48-49).  On February 12, 2008, FairFin and Fortress entered into a $50 million revolving credit agreement.  (Barton Decl. Ex. 27).

## B. **Procedural History**

Brevet commenced this action by filing a complaint on July 18, 2007, invoking the Court's diversity jurisdiction, and asserting a claim for breach of contract and seeking payment of the $1.5 million break-up fee and $31,371.75 in due diligence expenses. It amended its complaint on May 23, 2008, adding a claim for breach of the implied duty of good faith and fair dealing arising out of FairFin's alleged breach of the LOI. The amended complaint also sought payment of the $200,000 break-up fee in addition to the $1.5 million break-up fee.

FairFin answered the original complaint on September 7, 2007 and the amended complaint on July 11, 2008. In its Answers FairFin counterclaimed to recoup the due diligence advance it had paid Brevet.[4] The parties engaged in discovery, and both parties now move for summary judgment.

## **DISCUSSION**

FairFin advances several arguments in support of its motion for summary judgment and in opposition to Brevet's: First, it contends that Brevet never exercised its option to proceed with any of the three transactions set forth in the LOI by June 15, 2007, and therefore the exclusivity provision of the LOI was never triggered. Second, FairFin argues that even if the exclusivity provision was triggered, it never violated it. Third, it argues that, even if it violated the exclusivity

---

[4] FairFin has withdrawn this counterclaim. (See Def. Opp. at 3 n.1)

provision, it is not liable for a $1.5 million break-up fee --
which it argues would violate New York law -- but rather only a
$200,000 break-up fee.

As discussed below, I conclude that no reasonable jury
could find for FairFin on the questions of whether Brevet
exercised its option, and whether FairFin breached the
exclusivity provision of the LOI. As to FairFin's argument that
Brevet is only entitled to a $200,000 break-up fee, I conclude
that the provision regarding the $200,000 fee is inapplicable
here. As to the $1.5 million break-up fee, I conclude that
FairFin has failed to meet its burden that the fee would operate
as a penalty. Accordingly, FairFin's motion for summary judgment
is denied and Brevet's is granted.[5]

## A. **Applicable Standards**

### 1. **Summary Judgment**

The standards governing motions for summary judgment
are well-settled. A court may grant summary judgment only where
there is no genuine issue of material fact and the moving party
is therefore entitled to judgment as a matter of law. See Fed R.
Civ. P. 56(c); accord Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 585-87 (1986). Summary judgment should be

---

[5]    To the extent that Brevet is still asserting a claim
for breach of the implied duty of good faith and fair dealing --
a claim not addressed by either party -- that claim is dismissed
on the ground that it is duplicative of Brevet's breach of
contract claim.  See Jacobs Private Equity, LLC v. 450 Park LLC,
22 A.D.3d 347, 347-48, 803 N.Y.S.2d 14, 15 (1st Dep't 2005);
Cerberus Int'l, Ltd. v. BancTec, Inc., 16 A.D.3d 126, 127, 791
N.Y.S.2d 28, 30 (1st Dep't 2005).

denied "if the evidence is such that a reasonable jury could return a verdict" in favor of the non-moving party.  See NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 178-79 (2d Cir. 2008).  In deciding a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor.  In re "Agent Orange" Prod. Liab. Litig., 517 F.3d 76, 87 (2d Cir. 2008).  The non-moving party cannot, however, "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."  W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal citations and quotations omitted).

          In deciding a motion for summary judgment, the role of the Court is not to ask whether "the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Because the Court's role is limited in this respect, it may not make factual findings, determine credibility of witnesses, or weigh evidence. See Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005); Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996); United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994).

          A court faced with cross-motions for summary judgment need not "grant judgment as a matter of law for one side or the

- 13 -

other," but "'must evaluate each party's motion on its own
merits, taking care in each instance to draw all reasonable
inferences against the party whose motion is under
consideration.'" Heublein, Inc. v. United States, 996 F.2d 1455,
1461 (2d Cir. 1993) (quoting Schwabenbauer v. Bd. of Ed. of
Olean, 667 F.2d 305, 313-14 (2d Cir. 1981)).

## 2.  **Contract Interpretation Under New York Law**

The Agreement contains a choice-of-law provision
designating New York as the governing law, New York has a
reasonable relationship to the Agreement because Brevet is
located in New York, and neither party argues that any other
state's law should apply. (LOI § 15; Pl. Statement ¶ 27). The
Court will therefore apply New York contracts law. See Motorola
Credit Corp. v. Uzan, 388 F.3d 39, 51 (2d Cir. 2004) ("[W]here
the parties have chosen the governing body of law, honoring their
choice is necessary to ensure uniform interpretation and
enforcement of that agreement and to avoid forum shopping.");
Finucane v. Interior Constr. Corp., 264 A.D.2d 618, 620, 695
N.Y.S.2d 322, 324 (1st Dep't 1999) (holding that New York
enforces choice-of-law provisions provided that "(a) the law of
the State selected has a reasonable relationship to the agreement
and (b) the law chosen does not violate a fundamental public
policy of New York") (internal citations and quotations omitted).

Where a contract is unambiguous, the Court may
interpret its meaning as a matter of law. See Photopaint Techs.,
LLC v. Smartlens Corp., 335 F.3d 152, 160 (2d Cir. 2003). New

- 14 -

York courts interpret contracts "so as to give effect to the
intention of the parties as expressed in the unequivocal language
employed."  Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 355, 385
N.E.2d 1280, 1282, 413 N.Y.S.2d 352, 355 (1978).  A court should
not interpret a contract in a manner that would be "absurd,
commercially unreasonable, or contrary to the reasonable
expectations of the parties."  Lipper Holdings, LLC v. Trident
Holdings, LLC, 1 A.D.3d 170, 171, 766 N.Y.S.2d 561, 561 (1st
Dep't 2003) (internal citations omitted).  A contract should be
interpreted to give meaning to all of its terms.  See Mionis v.
Bank Julius Baer & Co., 301 A.D.2d 104, 109, 749 N.Y.S.2d 497,
502 (1st Dep't 2002) ("Courts are obliged to interpret a contract
so as to give meaning to all of its terms.  The reason is clear.
Since a contract is a voluntary undertaking, it should be
interpreted to give effect to the parties' reasonable
expectations.") (internal citations omitted).

**B.  Did Brevet Exercise Its Option on June 14, 2007?**

FairFin argues that the exclusivity provision of the
LOI was never triggered because Brevet never exercised its option
under the LOI.  Specifically, FairFin argues that the language
Brevet used in the June 14, 2007 letter -- "as of today, we
intend to move forward with the proposed transaction" -- was
insufficiently definite to create a binding commitment.  While
Brevet's language was arguably equivocal, no reasonable jury

could conclude that Brevet failed to exercise its option in the June 14, 2007 letter.

First, the clear gist of the letter was that Brevet was electing to proceed with the transaction.  The letter, taken as a whole, clearly shows that Brevet was informing FairFin that it was moving forward with the transaction.  There is no other reasonable interpretation of the letter when it is considered in its entirety.

Second, the subject of Brevet's letter was "Proceeding with Financing Transaction," and "Financing Transaction" is a defined term in the LOI.  Thus, Brevet's letter was clearly referring to the $75 million facility defined in the LOI as the "Financing Transaction."  In addition, Brevet's letter also references a July 6, 2007 closing date -- the same closing date set forth in the LOI for the Financing Transaction.

Third, the letter addressed concrete steps that Brevet had taken to proceed with the transaction.  Specifically, Brevet stated in the letter that it had retained a law firm to draft closing documents.  Brevet would not have retained a law firm if it had no intention of proceeding with the transaction.

Finally, FairFin's conduct after it received Brevet's letter belies its current contention that it did not believe Brevet had properly exercised its option.  Cf. 1 Corbin on Contracts, § 2.9, at 154-55 (1993 rev. ed.) ("The subsequent conduct and interpretation of the parties themselves may be

decisive of the question as to whether a contract has been made
. . . ."). Clearly, FairFin believed that Brevet had exercised
the option, as FairFin began to negotiate the documents with
Brevet. If FairFin truly believed the LOI had expired on June
15, 2007 due to Brevet's failure to exercise its option, it would
not have devoted substantial time and resources negotiating with
Brevet. The fact that it did conclusively demonstrates that it
believed Brevet had properly exercised its option.

Accordingly, I conclude that a reasonable factfinder
could only find that Brevet properly exercised its option under
the LOI. I now turn to whether FairFin violated its obligation
to deal exclusively with Brevet.

## C. **Did FairFin Violate the LOI's Exclusivity Provision?**

The crux of Brevet's complaint is that FairFin violated
the exclusivity provision of the LOI by entertaining a proposal
from Summit and Fortress regarding the warehouse line of credit.
FairFin argues that it was permitted under the LOI to negotiate
with Summit, and that it never had direct negotiations with
Fortress. FairFin also points out that it ultimately rejected
Summit's offer. Even assuming FairFin never directly negotiated
with Fortress, however, no reasonable jury could find that it did
not violate the exclusivity provision of the LOI.

It is true that the LOI recognizes FairFin's right to
negotiate with Summit -- but only as to the purchase of
receivables. The first sentence of the LOI provides only that

Summit is the competing buyer with respect to the offer "to purchase receivables." No mention is made of an offer from Summit to provide a line of credit or other long-term financing. It is thus clear that the Summit carve-out was intended only to permit FairFin to continue to negotiate with Summit to cover the Textron financing -- not to compete with Brevet over providing FairFin with future financing. Any other reading of the LOI simply makes no sense. Brevet would not have invested substantial time and resources -- at the opportunity cost of not pursuing other deals -- to close a financing with FairFin if it knew all along that it was merely being used as a stalking horse for FairFin to close a better deal with Summit.

It is undisputed that FairFin was, as early as late June 2007, negotiating with Summit regarding a possible line of credit. (See Durham 11/6/08 Aff. ¶ 51 (acknowledging that he had discussions with Crane of Summit regarding the line of credit)). There is also overwhelming documentary evidence, all discussed above, that FairFin and Summit engaged in such discussions. For example, on July 2, 2007, a FairFin executive emailed Summit to ask that Summit send "the Warehouse term sheet" to other FairFin executives that week. (Barton Decl. Ex. 21). Email correspondence sent just days later confirmed that Summit was to send FairFin the term sheet on July 9, 2007. (Id. Ex. 23). Perhaps most damaging is a July 7, 2007 email from FairFin's CEO in which he acknowledged that "we have been running several alternative paths." (Id. Ex. 24). Under the plain language of

the LOI, such discussions constitute, at a minimum, "encourag[ing] or entertain[ing]" proposals for a financing from Summit.  See Black's Law Dictionary 552 (7th ed. 1999) (defining "entertain" as, inter alia, "[t]o bear in mind or consider").

What Brevet bargained for in the LOI was an exclusivity period during which it would have an opportunity to make a deal with FairFin.  When FairFin negotiated with Summit regarding a line of credit during this period, it deprived Brevet of the benefit of the bargain.

While it is true that FairFin ultimately sent a letter to Summit declining the line of credit, that letter was sent after multiple contacts took place indicating that FairFin was, in violation of Section 7 of the LOI, "encourag[ing] or entertain[ing]" Summit's proposal.

Finally, FairFin's argument that it did not breach the exclusivity provision because none of its negotiations with Summit involved "substantive issues" is, even if true, entirely beside the point.  The LOI does not require any threshold level of negotiation before FairFin is considered to have breached the exclusivity provision.  On its face it prohibits any communications.  Moreover, the documentary and other evidence discussed above shows, as a matter of law, that there were substantive discussions.

I now turn to Brevet's argument that FairFin is obligated, under the LOI, to pay a $1.5 million break-up fee.

D.   **Is FairFin Liable for a Break-Up Fee for Entering Into the February 12, 2008 Agreement with Fortress?**

          Under the LOI, FairFin is liable to Brevet for a $1.5 million break-up fee if it "consummate[s] any transaction [] in lieu of the Financing Transaction" with Brevet.   To determine if FairFin is liable for the break-up fee by virtue of the agreement it entered into in February 2008 with Fortress,[6] the Court must resolve two issues.   First, was the transaction FairFin ultimately entered into with Fortress "in lieu of" the transaction with Brevet?   Second, is FairFin still liable even though it did not enter into the transaction until February 2008? I address each question in turn.

   1.   **Was the Fortress Transaction "In Lieu Of" the Transaction with Brevet?**

          It is undisputed that, at the time Brevet and FairFin began negotiating, FairFin was interested in obtaining long-term financing.   Brevet's agreement with FairFin was to provide a $75 million loan facility to be available for up to three years. Fortress, through Summit, proposed to extend to FairFin a similar line of credit, and in October 2007 -- just three months after negotiations between Brevet and FairFin ceased -- FairFin expressed interest in the deal.   That deal, for a $50 million

---

          [6]   Brevet does not argue that FairFin is liable for the $1.5 million break-up fee by virtue of having entered into the agreement with Summit.   The break-up fee regarding FairFin's deal with Summit is covered by the handwritten portion of Section 7, and is discussed in Section E of this Opinion.

revolving line of credit, ultimately closed in February 2008.
There is no indication in the record that FairFin closed any
other long-term financing.  Moreover, FairFin had previously
closed the $23 million deal with Summit.  The amount of that
deal, plus the $50 million line of credit from Fortress, totals
$73 million, almost precisely the amount of the Brevet-FairFin
transaction, providing further proof that the $50 million line of
credit was "in lieu of" the Financing Transaction.

Accordingly, I conclude that no reasonable jury could
find that the FairFin-Fortress deal was not in lieu of the
FairFin-Brevet deal.

## 2.    Did the LOI Terminate on July 6, 2007?

FairFin argues that the LOI terminated on July 6, 2007,
when the transaction did not close, and that it therefore cannot
be liable to Brevet for a transaction that took place some seven
months later.  This argument is rejected.

First, Section 11 provides that the LOI can only be
terminated upon the earlier of "the execution and delivery of the
Financing Documents" or written notice from either party,
"provided that termination by FairFin pursuant to this clause
shall not occur, and such notice shall not be delivered by
FairFin, prior to the date that is one hundred and twenty (90)
[sic] days from the date of this [LOI]."  (Emphasis in original).
FairFin, therefore, could not unilaterally terminate the LOI
until September 29, 2007 (120 days after June 1, 2007).  Here,

documents were not executed or delivered, and FairFin purported to terminate on July 11, 2007.  Hence, the purported termination was ineffectual.

Second, Section 7 expressly provides that its terms "shall survive the termination" of the LOI.

Third, even though the Fortress transaction did not close until well after September 29, 2007, the breach occurred well before then, as soon as FairFin began to encourage and entertain proposals for a line of credit.

FairFin argues, however, that even assuming the purported July 11, 2007 termination was ineffectual, because it could have terminated the LOI unilaterally at any time after 120 days, the fact that it did not do so before entering into the agreement with Fortress is legally insignificant.  Essentially, FairFin argues that after 120 days terminating the LOI was a mere formality with which it did not need to comply.  Even if it would have terminated the LOI before entering into the agreement with Fortress, however, that would still not change the fact that Section 7 survives termination of the LOI.  Moreover, this was not a matter of formality.  Again, Brevet bargained for 120 days of exclusivity, and it did not get the benefit of its bargain. If FairFin had honored the exclusivity provision, the Financing Transaction might very well have closed.

Accordingly, Brevet is entitled to a break-up fee for FairFin's violation of Section 7.

**E.   Is Brevet Only Entitled to a Reduced Break-Up Fee?**

FairFin argues that, even if Brevet is entitled to a break-up fee, it is only entitled to the $200,000 fee set forth in the handwritten addendum to Section 7.   That provision, however, is inapplicable here.   The language of the LOI is clear that the parties never contemplated that Brevet would receive both the $1.5 million and $200,000 break-up fees, as evidenced by the fact that the $200,000 fee is referred to as a "reduced Break-Up Fee."   (LOI § 7 (emphasis added)).   The presence of the word reduced implies that Brevet would only be entitled to the $200,000 break-up fee if it were not entitled to the $1.5 million fee.

The reason FairFin must pay Brevet a break-up fee is because it violated the exclusivity provision of Section 7 by entering into a financing agreement with Fortress in lieu of the agreement with Brevet.   Thus, even assuming FairFin had a reasonable belief that Brevet could not close the transaction by July 6, 2007, that has no bearing on the fact that Brevet is entitled to the $1.5 million fee set forth in Section 7.[7]

---

[7]     In its Amended Complaint, Brevet claims that it is owed the $200,000 break-up fee in addition to the $1.5 million break-up fee.   It is not clear to the Court if Brevet is still claiming it is entitled to both break-up fees.   To the extent that it is, I hold, as a matter of law, that Brevet is not entitled to the $200,000 break-up fee in addition to the $1.5 million fee.

**F.   Would Awarding Brevet a $1.5 Million Break-Up Fee Violate
New York Law?**

FairFin argues that the provision providing for a $1.5
million break-up fee is unenforceable under New York law because
it operates as a penalty imposed on FairFin for breaching the
LOI.

A break-up fee is a form of liquidated damages.  In re
Chateaugay Corp., 198 B.R. 848, 861 (S.D.N.Y. 1996).  A
liquidated damages provision is an estimate, made by the parties
when entering into a contract, of the damage that would result if
one party breached.  See Truck Rent-A-Center, Inc. v. Puritan
Farms 2nd, Inc., 41 N.Y.2d 420, 423-24, 361 N.E.2d 1015, 1017-18,
393 N.Y.S.2d 365, 368-69 (1977).  Determining whether a
liquidated damages provision is enforceable is a question of law
for the Court.  Vernitron Corp. v. CF 48 Assocs., 104 A.D.2d 409,
409, 478 N.Y.S.2d 933, 934 (2d Dep't 1984).  Under New York law,
"a contractually agreed upon sum for liquidated damages will be
sustained where (1) actual damages may be difficult to determine
and (2) the sum stipulated is not 'plainly disproportionate' to
the possible loss."  Walter E. Heller & Co. v. Am. Flyers Airline
Corp., 459 F.2d 896, 899 (2d Cir. 1972) (quoting Mosler Safe Co.
v. Maiden Lane Safe Deposit Co., 199 N.Y. 479, 485, 93 N.E. 81,
81 (1910)).

Courts should invalidate a liquidated damages clause
only in "'rare cases.'"  Seven Corners Shopping Ctr. Falls

Church, Va. Ltd. P'ship v. Chesapeake Enters. U.S. LLC, No. 07
Civ. 6332 (MAT), 2009 U.S. Dist. LEXIS 20445, at *21 (W.D.N.Y.
Mar. 13, 2009) (quoting Fifty States Mgmt. Corp. v. Pioneer Auto
Parks, Inc., 46 N.Y.2d 573, 577, 389 N.E.2d 113, 116, 415
N.Y.S.2d 800, 802-03 (1979)).  The party opposing enforcement of
a liquidated damages provision bears the burden of proving that
the provision operates as a penalty.  See JMD Holding Corp. v.
Cong. Fin. Corp., 4 N.Y.3d 373, 380, 828 N.E.2d 604, 609, 795
N.Y.S.2d 502, 506 (2005) ("The burden is on the party seeking to
avoid liquidated damages . . . to show that the stated liquidated
damages are, in fact, a penalty."); Wechsler v. Hunt Health Sys.,
330 F. Supp. 2d 383, 413 (S.D.N.Y. 2004) (same).

Here, FairFin has simply not met its burden of showing
that Brevet's actual damages could be readily determined or that
the $1.5 million break-up fee is "plainly disproportionate" to
Brevet's losses.  FairFin's argument consists entirely of
conclusory statements unsupported by any record evidence.  In
fact, to the contrary, the evidence supports the reasonableness
of the break-up fee.  The LOI contemplated a $75 million
transaction, and with a transaction that size, Brevet's profits
surely would have reached $1.5 million, more or less.  Under
these circumstances, a $1.5 million break-up fee is not
unreasonable as a matter of law.

Because FairFin freely signed the LOI containing the
liquidated damages provision, and because it has not met its
burden of proving that the provision operates as a penalty, or

- 25 -

even, at this summary judgment stage, of providing evidence from which a reasonable fact finder could find a penalty, the provision will be enforced.  Cf. GFI Brokers, LLC v. Santana, Nos. 06 Civ. 3988, 4611 (GEL), 2008 U.S. Dist. LEXIS 65606, at **2-3 (S.D.N.Y. Aug. 27, 2008) ("[T]he party challenging the enforceability of a liquidated damages clause 'has the burden of proving that the . . . clause to which it freely contracted is, in fact, a penalty.'") (quoting Rattigan v. Commodore Int'l Ltd., 739 F. Supp. 167, 170 (S.D.N.Y. 1990)).  Accordingly, Brevet is entitled to a break-up fee in the amount of $1.5 million.

## G.    Is Brevet Entitled to Reimbursement for Due Diligence Expenses?

Section 8 of the LOI provides that FairFin "shall pay and reimburse" Brevet for all costs and expenses incurred while conducting due diligence, "whether or not the Financing Transaction contemplated hereby actually closes."  FairFin advanced Brevet $50,000 to cover expenses when they entered into the LOI, but Brevet incurred $81,371.75 in expenses, primarily in attorneys' fees.  Brevet is entitled to payment from FairFin for the difference of $31,371.75.  The language of the LOI is clear, the amount sought is reasonable, and FairFin does not appear to challenge Brevet's claim that it is entitled to reimbursement.

### CONCLUSION

For the foregoing reasons, FairFin's motion for summary judgment is denied and Brevet's is granted.  Judgment will be

entered against FairFin in the amount of $1,531,371.75, with costs.  The Clerk of the Court shall enter judgment accordingly and close the case.

        SO ORDERED.

Dated:    New York, New York
          May 19, 2009

                                DENNY CHIN
                                United States District Judge

- 27 -